CASE NO. 14-2506

IN THE

UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

CARLOS POWELL,
*Defendant-Appellant.*

**On Appeal from the United States District Court
for the Eastern District of Michigan
Southern Division**

**DEFENDANT-APPELLANT'S BRIEF ON APPEAL**

N. C. Deday LaRene
LARENE & KRIGER, P.L.C.
Attorney for Petitioner-Appellant
1717 Penobscot Building
Detroit, Michigan 48226
(313) 967-0100

ORAL ARGUMENT REQUESTED

# TABLE OF CONTENTS

TABLE OF CASES, STATUTES, & AUTHORITIES . . . . . . . . . . . . . . . . . . . . iii

STATEMENT IN SUPPORT OF ORAL ARGUMENT . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION . . 2

STATEMENT OF ISSUES FOR REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

ARGUMENT I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

      THE TRIAL COURT IMPROPERLY DENIED MR. POWELL'S
      PROPERLY ASSERTED RIGHT TO REPRESENT HIMSELF.

ARGUMENT II . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

      THE TRIAL COURT ERRED IN DENYING DEFENDANT'S
      MOTION TO SUPPRESS CELLULAR TELEPHONE
      IDENTIFICATION AND LOCATION DATA.

      The trap-and-trace orders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

      The cell-site/GPS warrants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

      The warrantless use of tracking devices . . . . . . . . . . . . . . . . . . . . . . 36

ARGUMENT III . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

THE ADMISSION OF EVIDENCE ACQUIRED BY POLE CAMERAS, AND EVIDENCE DERIVED THEREFROM, VIOLATED DEFENDANT'S FOURTH AMENDMENT RIGHTS.

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

ADDENDUM (DESIGNATION OF DISTRICT COURT DOCUMENTS) . . . . 61

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

# TABLE OF CASES, STATUTES, & AUTHORITIES

CASES                                                                PAGE

*Faretta v. California*, 422 U.S. 806 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Franks v. Delaware,* 438 U.S. 154 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Godinez v. Moran,* 509 U.S. 389 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Illinois v. Allen,* 397 U.S. 337 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Illinois v. Krull,* 480 U.S. 340 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*In re Application of U.S. for an Order Directing a Provider of Electronic Communication Service to Disclose Records to Government,* 620 F.3d 304 (3d Cir.2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Martinez v. Court of Appeal of Cal.*, 528 U.S. 152 (2000) . . . . . . . . . . . . . . . . . . 9

*McKaskle v. Wiggins,* 465 U.S. 168 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 21

*Rivera v. United States*, 928 F.2d 592 (2d Cir.1991) . . . . . . . . . . . . . . . . . . . . . 30

*Smith v. Maryland,* 442 U.S. 735 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*United States v. 92 Buena Vista Avenue,* 507 U.S. 111 (1993) . . . . . . . . . . . . . . 33

*United States v. Abdulmutallab,* 739 F.3d 891 (6th Cir. 2014) . . . . . . . . . . . . . . 9

*United States v. Anderson-Bagshaw,* 509 Fed. Appx. 396 (6th Cir. 2012) . . . 56, 57

*United States v. Beauchamp,* 659 F.3d 560 (6th Cir. 2011) . . . . . . . . . . . . . . 43, 49

*United States v. Brown,* 448 F.3d 239 (3d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . 49

*United States v. Caceres*, 440 U.S. 741 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*United States v. Ceccolini*, 435 U.S. 268 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*United States v. Cuevas-Sanchez,* 821 F.2d 248 (5th Cir.1987) . . . . . . . . . . . . . 57

*United States v. Davis,* 430 F.3d 345 (6th Cir. 2005) . . . . . . . . . . . . . . . . . . . 34, 35

*United States v. Dupree,* 617 F.3d 724 (3d Cir. 2010) . . . . . . . . . . . . . . . . . . . . 49

*United States v. Forest,* 355 F.3d 942 (6th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . 26

*United States v. Gross,* 662 F.3d 393 (6th Cir. 2011) . . . . . . . . . . . . . . . . 42, 45, 48

*United States v. Henderson,* 626 F.3d 326, (6th Cir. 2010) . . . . . . . . . . . . . . . . . 16

*United States v. James,* 328 F.3d 953 (7th Cir. 2003) . . . . . . . . . . . . . . . . . . 13, 19

*United States v. Johnson*, 656 F.3d 375 (6th Cir.2011) . . . . . . . . . . . . . . . . . 22, 50

*United States v. Jones,* ____ U.S. ___, 132 S.Ct. 945 (2012) . . . . . . . . . . . . 38, 55

*United States v. Kelley,* 774 F.3d 434 (8th Cir. 2014) . . . . . . . . . . . . . . . . . . . . . 9

*United States v. Leon*, 468 U.S. 897 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 34

*United States v. Lopez-Arias*, 344 F.3d 623 (6th Cir.2003) . . . . . . . . . . . . . . . . . 45

*United States v. McKinley,* 58 F.3d 1475 (10th Cir. 1995) . . . . . . . . . . . . . . . . . 19

*United States v. Orlando,* 281 F.3d 586 (6th Cir. 2002) . . . . . . . . . . . . . . . . . . . 28

*United States v. Page*, 232 F.3d 536 (6th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . 28

*United States v. Reilly*, 76 F.3d 1271 (2d Cir.1996) . . . . . . . . . . . . . . . . . . . . . . 35

*United States v. Shaw,* 464 F.3d 615 (6th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . 48

*United States v. Skinner,* 690 F.3d 772 (6th Cir. 2012) . . . . . . . . . . . . . . . . . . . 28

*United States v. Sullivan*, 431 F.3d 976 (6th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . 16

*United States v. Trujillo*, 376 F.3d 593 (6th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . 16

*United States v. Warshak,* 631 F.3d 266 (6th Cir 2010) . . . . . . . . . . . . . . . . . . . . . . 35

*United States v. Washington*, 797 F.2d 1461 (9th Cir. 1986) . . . . . . . . . . . . . . . . . 33

*United States v. Williams,* 641 F.3d 758 (6th Cir.2011) . . . . . . . . . . . . . . . . . . . . . . 9

*Wong Sun v. United States,* 371 U.S. 471 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . 47

STATUTES, COURT RULES, AND OTHER AUTHORITIES

Title 18, United States Code . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Title 21, United States Code . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. § 1956(a)(1)(A)(I) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

18 U.S.C. § 1956(a)(1)(B)(I) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

18 U.S.C. § 1956(h) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

18 U.S.C. § 2703 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

18 U.S.C. § 3122(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

18 U.S.C. § 3123 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

18 U.S.C. § 3127 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

18 U.S.C. § 924(c)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

18 U.S.C. §3231 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

21 U.S.C. §841(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

21 U.S.C. § 846 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

28 U.S.C. §1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

47 U.S.C. § 1001, *et seq* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

47 U.S.C. § 1002(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Rule 32(a)(7)(B), Federal Rules of Appellate Procedure . . . . . . . . . . . . . . . . . . . 60

Federal Judicial Center, *Bench Book for United States District Judges* (2013) . . 13

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

This case should not be submitted without oral argument. The factual matrix and the issues presented are of sufficient complexity as to require the interplay of oral argument to properly present them for review.

1

## STATEMENT OF SUBJECT MATTER
## AND APPELLATE JURISDICTION

The indictment in which Carlos Powell was charged stated offenses against the United States, defined in Titles 18 and 21, United States Code. The trial court had subject matter jurisdiction over the proceedings under 18 U.S.C. §3231. Defendant-Appellant appeals from final judgments of the district court which disposed of all claims of all the parties to this appeal which were ripe for adjudication as of the time of their entry. The judgment and commitment order which completed the trial proceedings in the district court was entered November 10, 2014, and a Notice of Appeal therefrom was filed on that same day. This Court is vested with appellate jurisdiction over this appeal under the provisions of 28 U.S.C. §1291.

**STATEMENT OF ISSUE FOR REVIEW**

I

WHETHER THE TRIAL COURT IMPROPERLY DENIED MR. POWELL'S PROPERLY ASSERTED RIGHT TO REPRESENT HIMSELF?

II

WHETHER THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION TO SUPPRESS CELLULAR TELEPHONE IDENTIFICATION AND LOCATION DATA?

III

WHETHER THE ADMISSION OF EVIDENCE ACQUIRED BY POLE CAMERAS, AND EVIDENCE DERIVED THEREFROM, VIOLATED DEFENDANT'S FOURTH AMENDMENT RIGHTS?

**STATEMENT OF THE CASE**

Carlos Powell was one of fourteen defendants charged in a 29-count Superseding Indictment, R.E. 171, returned in the United States District Court for the Eastern District of Michigan on January 15, 2013.[1]

He was charged in seven of those counts: Count One, conspiracy to possess with intent to distribute and distribute marijuana, five kilograms or more of cocaine, and one kilogram of heroin, 21 U.S.C. § 846, Count Three, possession with intent to distribute five or more kilograms of cocaine, 21 U.S.C. §841(a)(1), Count Four, possession with intent to distribute one kilogram or more of heroin, 21 U.S.C. §841(a)(1), Count Five, carrying or possession of a firearm in further of the drug conspiracy alleged in Count One, 18 U.S.C. § 924(c)(1), Count Ten, conspiracy to launder monetary instruments, 18 U.S.C. § 1956(h), and Counts Eleven and Twelve, money laundering, 18 U.S.C. § 1956(a)(1)(A)(I) and (B)(I). The indictment also contained criminal forfeiture allegations.

On April 28, 2014, the government moved to dismiss the substantive money laundering counts, R.E. 299, 300, and the trial court thereafter granted that motion. R.E. 356.

---

[1] The original Indictment R.E. 3, in which defendant was also charged, was returned February 1, 2012.

Mr. Powell and three other defendants proceeded to trial before Senior United States District Judge Stephen J. Murphy, III, and a jury, and on May 15, 2014, he was found guilty of all of the charges against him. On October 17, 2014, he was sentenced to concurrent terms of life in prison as to Counts One, Three, and Four, a concurrent term of 20 years as to Count Ten, and 60 months as to Count Five, to run consecutively, and, should he be released from prison, concurrent terms of five years of Supervised Release, as well as Special Assessments totaling $500.

On November 10, 2014, the district court filed a judgment and commitment order incorporating that sentence. R.E. 469. On that same day he filed his notice of appeal. R.E. 471.

**STATEMENT OF FACTS**

It was the government's theory at trial that Carlos Powell was the leader of a drug trafficking organization headquartered in the Detroit Metropolitan area, that received large quantities of marijuana, cocaine, and heroin from persons associated with Mexican drug traffickers, for redistribution. While the government offered the testimony of an individual named Tadeuscz Morawa, who claimed to have served as liaison between Mr. Powell and the suppliers, and to have supervised the transportation of the drugs and money involved, *see, e.g.,* R.E. 491, Page ID # 4340-4346, 4370-4371, the heart of the government's case consisted of testimony regarding surveillance of the defendants and others, and searches and seizures which yielded large quantities of drugs and money, as well as documents which the government characterized as drug records.

Mr. Powell does not challenge the sufficiency of the evidence upon the basis of which he was convicted and sentenced, nor assert any claims based on the trial court's evidentiary rulings, save two: its denial of his motion to suppress evidence garnered and derived from the acquisition of location information in a variety of ways (trap-and-trace devices, real-time cell-site and GPS data, and GPS tracking devices surreptitiously mounted on vehicles), and from video cameras mounted on utility poles in three different locations.

Accordingly, a detailed exposition of the trial evidence does not seem necessary. Moreover, since the facts relating to the searches and seizures at issue are best presented in connection with the discussion of those issues, the writer will leave the further development of those facts to the presentation of those issues.

Because Mr. Powell timely sought to invoke his right to represent himself, was competent to do so, and because the record did not demonstrate any reason to believe that he would disrupt the proceedings at trial, require a continuance of the trial, or otherwise interfere with the orderly processes of the Court, the trial judge clearly should have honored his request.

The trial judge erred in denying Mr. Powell's Motion to Suppress Evidence derived from the collection of location data. The trap and trace orders at issue allowed the collection of data beyond that which the statute under which they were issued allow, and the inclusion of that improperly information tainted the cell-site/GPS warrants which followed, which were unsupported by probable cause and overbroad, and these circumstances (as well as the improper omission of information from the warrants upon which the warrants were issued) precluded the application of the "good faith" exception to the exclusionary rule. In addition, the unlawful warrantless use of GPS tracking devices, which was integral to the overall investigation, required the exclusion of evidence acquired through their exploitation.

Finally, the lengthy employment of pole cameras, without a showing or finding of probable cause, was a Fourth Amendment violation, and evidence based on the exploitation of information acquired through the cameras should have been excluded.

**ARGUMENT**

**I**

THE TRIAL COURT IMPROPERLY DENIED MR. POWELL'S PROPERLY

ASSERTED RIGHT TO REPRESENT HIMSELF.[2]

As this Court wrote in *United States v. Abdulmutallab,* 739 F.3d 891, 903 (6th

Cir. 2014):

> The Sixth Amendment guarantees criminal defendants the right to counsel. U.S. Const. Amend. VI. It is undisputed that criminal defendants also have a constitutional right to waive the right to counsel and choose self-representation, even when a court believes that self-representation is not advisable. *Faretta v. California*, 422 U.S. 806, 807, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). Any waiver of the right to counsel must be knowingly, voluntarily, and intelligently made. *Iowa v. Tovar*, 541 U.S. 77, 87-88, 124 S.Ct. 1379, 158 L.Ed.2d 209 (2004).

To be sure, the right to self-representation "is not absolute." *Martinez v. Court*

*of Appeal of Cal.*, 528 U.S. 152, 161 (2000). As the Supreme Court noted in the

seminal case of *Faretta v. California*, 422 U.S. 806, 834 n. 46 (1975), "[t]he right of

---

[2] **Standard of Review.** "This Court has not clearly identified the appropriate standard of review for a trial court's decision to *allow* waiver of counsel. *See United States v. Williams,* 641 F.3d 758, 766 (6th Cir.2011). Decisions from other Circuits, however, make clear that a district court's decision to *deny* a request for self-representation is subject to *de novo* review. *See, e.g., United States v. Kelley,* 774 F.3d 434, 441-442 (8th Cir. 2014); *United States v. Mosley*, 607 F.3d 555, 558 (8th Cir.2010). Furthermore, it is clear that denial of the right to self-representation "is not amenable to 'harmless error' analysis." *McKaskle v. Wiggins,* 465 U.S. 168, 177 n. 8 (1984).

self-representation is not a license to abuse the dignity of the courtroom.  Neither is it a license not to comply with relevant rules of procedural and substantive law." It is on this basis that the *Faretta* Court held that "the trial judge may terminate self-representation by a defendant who deliberately engages in serious and obstructionist misconduct." *Ibid*.;  *cf. Illinois v. Allen,* 397 U.S. 337, 342-43 (1970) (holding that a defendant can forfeit his Sixth Amendment right to be present in trial if he insists on being "so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom").

At a pre-trial conference held March 26, 2014 (35 days prior to the scheduled trial date of April 29), counsel for Carlos Powell, who was in attendance, announced to the trial judge that his client had informed him that he wished to represent himself at trial. R.E 490, Transcript, Page ID # 4199. He suggested that the court was required "to make an inquiry," but asked, "so that perhaps I can talk to Mr. Powell further," that that inquiry should take place "in the very near future." *Id.,* Page ID, at # 4199-4200.  Because counsel for Eric Powell had failed to appear for the hearing, it was agreed that the *Faretta* inquiry take place at the continued date of Eric Powell's pretrial. *Id.,*  at Page ID # 4201-4201.

Although counsel had advised the trial court that he would be available within the next several days, and expressed the opinion that "this . . . is a bridge that we need

to cross sooner rather than later," *id.,* at Page ID # 4201, the continuation of the

hearing did not take place until April 10.

The trial judge began by noting the fact that the trial was by then only nineteen

days away, and stating that, out of docket management considerations, "[t]here won't

be any continuance." R.E. 287, Transcript, Page ID # 2179-2180.  He then asked Mr.

Powell if it was in fact his wish to "relieve your counsel," to which the defendant

answered "Yes, it is."  *Id.,* at Page ID # 2180.  The following colloquy then ensued:

> THE COURT: Okay. And why do you want to do that?
>
> DEFENDANT CARLOS POWELL: It's particular documents I need to file, and also you stated that the attorney didn't file the documents so you're striking them.
>
> THE COURT: Right. All right. So you're – well, let me -- let me ask you a couple of things. Let's be realistic here. The things that I struck, I don't know where they came from, but they are the typical things we see in other cases that have been generally adjudged to be protest-oriented irrelevant, meritless going to the substance of the case. I don't accept filings from individuals who are represented, and I take it your lawyer probably didn't file them because he knew that the Court -- the Court wouldn't look at them.
>
> Now, if I hear you correctly, you're saying in order to file documents that may have a very negative impact on your case and get that opportunity, you want to fire your lawyer. And then the additional consequences is to have this trial on the 19th [*sic*] without him at your side because it's so important for you to file these documents. Is that what you're saying?
>
> DEFENDANT CARLOS POWELL: I have Constitutional issues.

11

THE COURT: Yeah.

DEFENDANT CARLOS POWELL: So how else will I get them filed?

THE COURT: Well, if you have a lawyer, he files them for you, okay? If he doesn't file them for you, then that should tell you that, in general, you may not have a real good Constitutional argument there. I mean we've had two years of litigation to file your documents, and they -- the only ones I've seen that have come from you personally I struck because they weren't valid, okay? They weren't of legal significance. \

So what I'm telling you is you're about to face a trial of a very significant magnitude that could result in a life sentence, and in order to file documents that have no legal significance, you're going to fire a lawyer who could help you significantly with that trial?

DEFENDANT CARLOS POWELL: My life is on the line, Your Honor.

THE COURT: Okay.

DEFENDANT CARLOS POWELL: So I'm here to present myself the best way I can.

*Id.,* at Page ID # 2180-2182.

The "documents" referred to in the colloquy were a series of *pro se* submissions which had been filed in the criminal case, R.E. 238, 239, and stricken by an Order filed March 4, 2014, R.E. 243, Order, Page ID # 1838 (referred to in the preceding colloquy), and in a forfeiture matter, *United States of America v. Real Property Fulton County, Georgia,* No. 2:10-cv-14908, R.E. 25, Order, Page ID # 704, as well as on a Miscellaneous Dockets, *In re Sealed Matter,* No. 2:10-mc-50396, where they have not

12

been struck.  *See, e.g.,* R.E. 83, 88, 92, 95, 109-111.  Those documents, which took a variety of forms, embodied beliefs of what is known as Moorish Science, including the belief - briefly summarized here - that the authority of the courts of the United States over citizens of the Moorish Empire, including, due to his ancestry, Mr. Powell, is circumscribed by treaty obligations with that Empire.  *See generally, United States v. James,* 328 F.3d 953, 954 (7th Cir.  2003).

After inquiring whether Mr. Powell and his retained counsel "get along" (he said that they did), *id.,* at Page ID # 2182, the trial judge then proceeded to make an inquiry patterned after Section 1.02 of  the *Bench Book for United States District Judges,*[3] as Circuit precedent requires. *See, United States v. Ross,* 703 F.3d 856, 867 (6th Cir. 2012) .

In the course of that colloquy, which is found at R.E. 287, Transcript, Page ID # 2182- 2189, Mr. Powell acknowledged that he had not studied law, or the Federal Rules of Evidence, had not previously represented himself, that he recognized that if he did represent himself he would not "get any special privileges," and that he was making the decision to do so freely and voluntarily.

What also emerged from the colloquy was that the trial judge believed that Mr. Powell was "a pretty sharp guy," and was suspicious of his intentions.  For example,

---

[3] Federal Judicial Center, *Bench Book for United States District Judges* (2013).

at one point he opined that although he was "not prepared to say that you're engaged in a ploy to avoid trial at the last minute," he also expressed the opinion that "Mr. Powell is -- is in a position where it might behoove him to not be as familiar with court principles and be more familiar with some of these meritless arguments than -- than you might think," and that he was "reluctant to let an individual represent himself so that he can file what I suspect are frivolous papers with the Court when there's no breakdown in the representation." *Id.,* at Page ID # 2187, 2189.

After soliciting the observations and positions of defense counsel and the government,[4] Judge Murphy held that he would not permit Mr. Powell to exercise his right of self-representation, even after Mr. Powell reasserted it in response to his remarks:

> THE COURT: All right. *U.S. vs. Henderson* says that factors for the Court to explore when considering whether to grant a request for new counsel or request to represent an individual for self-representation, even with an indigent defendant, as was the case in *U.S. versus Trujillo*, 376 F.3d593, are, number one, the timeliness of the motion. In a two-year-plus drug conspiracy case set for trial and adjourned several times and set for trial in stone as long ago as January of this year, this motion is untimely. It's only brought up at the pretrial conference.

---

[4] Government counsel stated: "I believe defendant has a Constitutional right to represent himself and the government takes no position in that regard. It appears that he is making this decision knowingly and voluntarily and I believe that he has a right to represent himself." *Id,* at Page ID # 2190. Defense counsel's response was: "I don't think I get to have a position, Judge." *Id.,* at Page ID # 2189

Secondly, the adequacy of the Court's inquiry into the matter. I've asked all of the questions that the benchbook and the circuit law that I've been able to uncover says that I should ask, and neither lawyer has advanced any additional questions that I should ask.

Number three, the extent of the conflict between the attorney and the client and whether it was so great that it resulted in a total lack of communication preventing an adequate defense. There is no conflict between the attorney and the client. The client wants to file frivolous papers that I've already struck and that many courts have determined to be without any legal significance, and the lawyer won't do that it appears.

And finally, the balancing of the factors with the public's interest and a prompt and efficient administration of justice. Two-year case, ready for jury trial, four other defendants, two prosecutors, asset forfeiture, DEA, enormous amount of evidence, I don't see a single factor that -- that convinces me to let this man represent himself, right? Anybody?

DEFENDANT CARLOS POWELL: I asked for it, Your Honor.

THE COURT: What's that?

DEFENDANT CARLOS POWELL: I asked for it.

THE COURT: Okay. Well, okay, but what -- I just went through -- you can ask for whatever you want. You can ask me to give you a million dollars, and I would like to do that but I don't -- I don't have it. No good cause and the ability to deny a motion to represent a defendant by himself is made clear by *U.S. vs. Sullivan*, Sixth Circuit, 431 F.3d. 976 (980), Sixth Circuit,2005. I hesitate to say what I think this really is, so I won't. But I don't see any reason to get one of the best lawyers in town off of a case so that we can file papers that -- that -- that don't look good. So unless anybody else has anything to say, this motion is denied, okay?

*Id.,* at Page ID # 2190-2192.

Six days later, on April 16, the government filed a Motion for Reconsideration of this ruling, R.E. 263, asserting its "interest in ensuring that Defendant's constitutional rights are respected and minimizing any potential error that could jeopardize the finality of the trial verdict on appeal." *Id.,* at Page ID #2004. "To that end," the motion stated, "the government requests the court reconsider its denial of Defendant's motion to proceed *pro se*, and instead grant Defendant's request while allowing his defense counsel to serve as stand-by counsel at trial." *Ibid.*

The government's motion pointed out that two of the cases cited by Judge Murphy, *United States v. Trujillo*, 376 F.3d 593 (6th Cir. 2004), and *United States v. Sullivan*, 431 F.3d 976 (6th Cir. 2005), "did not involve a request for self-representation, but rather for substitution of counsel,"[5] and that that the requests in those cases were made either immediately before or during trial, while Mr. Powell "made his request nearly three weeks prior to the start of trial and acknowledged that the dismissal of his attorney would not result in a continuance of the April 29 trial date." *Id.* at Page ID # 2006-2007.

On April 23, 2014, Judge Murphy denied the government's motion for reconsideration. R.E. 286, Order.

--------

[5] This is also true of the third case referred to by the trial judge - *United States v. Henderson,* 626 F.3d 326, (6th Cir. 2010).

16

As what he deemed a "threshold" matter, he "assumed" the timeliness of Mr. Powell's assertion of his right to self-representation: "because Powell made known his desire to proceed *pro se* during the final pretrial conference, which was held roughly a month before the trial, the Court will assume, without deciding, that his request is timely." *Id.,* at Page ID # 2170.  He hewed, however, to the conclusion implicit in his previous ruling: "that [Mr.] Powell's request was not made in good faith but was intended as a tactic to delay the trial." *Id.,* at Page ID # 2170-2171.  His explanation was as follows:

> Although there is no definitive list of factors to consider when determining whether a request for self-representation is genuine, the Tenth Circuit in *United States v. Mackovich*, 209 F.3d 1227 (10th Cir. 2000), affirmed a district court's finding that a "defendant's requests for self-representation were merely a tactic for delay" when, among other things, that the defendant had "utilized appointed counsel for more than seven months," "appeared in court with his attorney on multiple occasions," "sought and received three other continuances," and "based his request for self-representation in part on counsel's refusal to file a variety of frivolous motions." *Id.* at 1237.

> Similar facts are present here. First, Powell has been ably represented by Mr. LaRene for over two years. During that time, Mr. LaRene has filed major motions to suppress, *see* Mot. to Suppress, ECF No. 74, Mot. to Suppress Pole Cameras, ECF No. 145, and discussed a plea with the Government. Despite this record of representation, Powell first expressed his desire to represented himself shortly before trial.

> Moreover, during the colloquy, Powell himself admitted that he believed Mr. LaRene had done a good job representing him. *See Robards*,[*v. Rees,*] 789 F.2d [379,] 383 [(6th Cir. 1986)] ("[Attorney] noted that [defendant] had not expressed any displeasure with the quality

17

of his attorney's efforts prior to the day of trial."). Powell also stated that the primary basis for the dispute between him and Mr. LaRene was simply over whether Powell should, or would be permitted to, file additional frivolous documents related to the Moorish Science Temple.

The trial has been delayed several times and for several months. To be sure, some of the delays occurred while the Court resolved the fact-intensive motions to suppress. But all other pre-trial matters have been complete for months, there are no more outstanding issues to be resolved, and the next step is trial. *See United States v. Kaczynski*, 239 F.3d 1108, 1116 (9th Cir. 2001) ("[A] court may consider the effect of delay as evidence of a defendant's intent along with events preceding the motion 'to determine whether they are consistent with a good faith assertion of the Faretta right and whether the defendant could reasonably be expected to have made the motion at an earlier time.'") (quoting *Fritz v. Spalding*, 682 F.2d 782, 784 (9th Cir. 1982)). The Court thus remains convinced that Powell seeks to represent himself merely to delay trial. *See Lewis v. Robinson*, 67 F. App'x 914, 919-20 (6th Cir. 2003) ("[T]he conclusion that Petitioner did not assert his *Faretta* right genuinely and in good faith, but rather, as a last-ditch effort to delay the proceedings, does not appear to be clearly erroneous."). Because the Government has not shown a palpable defect in the Court's original conclusion and order, the Court will deny the motion for reconsideration.

*Id.,* at Page ID # 2171-2172 (footnote omitted).

Unlike the cases cited by Judge Murphy, there was no factual basis whatsoever for any inference or conclusion that Mr. Powell's assertion of his constitutional right to represent himself was for the purpose of delay, or, if granted, would have necessitated delay. Indeed, as the government's Motion for Reconsideration pointed out, Mr. Powell had specifically acknowledged that the trial would proceed as scheduled.

18

Nor is there any basis in the record for any inference or conclusion that recognizing Mr., Powell's assertion of his constitutional right to represent himself would have resulted in any other kind of disruption of the orderly processes of the court, or that it was intended to do so. To the contrary, in his colloquy with the trial judge, Mr. Powell was polite, respectful, and did not suggest in any way a lack of understanding of his place in the proceedings, or his willingness to abide by appropriate standards of conduct and decorum. Indeed, as he repeatedly confirmed, he understood that he would not "get any special privileges."

Judge Murphy repeatedly expressed concern that Mr. Powell wished to espouse legal positions which he described as "frivolous." However, the right recognized by *Faretta* does not stand or fall (as Judge Murphy seemed to think) on the legal merit of the position which the defendant wishes to advocate on his own behalf, any more than it does on a defendant's "legal prowess." *United States v. McKinley,* 58 F.3d 1475, 1481 (10th Cir. 1995).

Rather, as Judge Easterbrook explained for the Seventh Circuit in *United States v. James, supra,* "any defendant competent to stand trial also is competent to represent

himself,"[6] and, of course, "[m]any litigants articulate beliefs that have no legal support." *Id.,* at 955.[7]

---

[6] In support of this proposition Judge Easterbrook cited *Godinez v. Moran,* 509 U.S. 389, 399 (1993), in which the Court held that "the competence that is required of a defendant seeking to waive his right to counsel is the competence to waive the right, not the competence to represent himself. . . . a criminal defendant's ability to represent himself has no bearing upon his competence to choose self-representation. *Id.,* at 399-400.

[7] *United States v. James* also involved an adherent of the Moorish Science faith, who had been allowed to represent himself at trial, but whose appellate counsel argued should, because of those beliefs, have been declared incompetent, a proposition which the panel rejected:

> Many litigants articulate beliefs that have no legal support--think of tax protesters who insist that wages are not income, that taxes are voluntary, or that only foreigners must pay taxes; or think of homeowners who contend that because their property can be traced to a land grant signed by President Fillmore their mortgages can't be foreclosed. Sometimes these beliefs are sincerely held, sometimes they are advanced only to annoy the other side, but in neither event do they imply mental instability or concrete intellect (see *Young v. Walls*, 311 F.3d 846 (7th Cir.2002)) so deficient that trial is impossible. Airline pilots, *see Cheek v. United States*, 498 U.S. 192, 111 S.Ct. 604, 112 L.Ed.2d 617 (1991), dentists, *see United States v. Dunkel,* 927 F.2d 955 (7th Cir.1991), and other persons of unquestioned competence have espoused ludicrous legal positions. No one suggested that Captain Cheek or Dr. Dunkel required a mental exam; if their weird legal views did not imply incompetence to be tried, why should James's? It is not as if James inhabited a private mental world. His beliefs are held by other adherents to the Moorish Science Temple. *See, e.g.*, *United States v. Frazier-El,* 204 F.3d 553 (4th Cir.2000)

*Id.,* at 955.

The right of self-representation is not subject to merits-testing. That is to say, it "exists to affirm the dignity and autonomy of the accused," *McKaskle v. Wiggins,* 465 U.S. 168, 176-177 (1984), and while it also exists "to allow the presentation of what may, at least occasionally, be the accused's best possible defense," at the same time "when exercised usually increases the likelihood of a trial outcome unfavorable to the defendant." *Id.,* at 177 and n. 8. The trial judge's refusal to honor Mr. Powell's timely, competent, assertion of his right to represent himself was simply improper, and requires that Mr. Powell's convictions and sentences be set aside.

## II

THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION TO
SUPPRESS CELLULAR TELEPHONE IDENTIFICATION AND LOCATION
DATA.[8]

Prior to trial, Mr. Powell moved to suppress evidence derived from the acquisition of data of various kinds, and in various ways relating to cellular telephones, and evidence derived from the exploitation of that data by the investigators, all of which was central to their conduct of the investigation that led to Mr. Powell's indictment and conviction. R.E. 74, Motion. Specifically, the challenged data-collection methods were as follows:

- Beginning on March 11, 2010, the government sought, and secured the issuance of Rule 41 search warrants for live (or "real time") cell site data and precise GPS location data for mobile telephones, for periods of 30 and 45 days each;

- Beginning on March 16, 2010, the government sought and received, based upon the purported authority of 18 U.S.C. § 3123, Orders authorizing the use of a pen register and trap and trace device to identify the telephone number and other identification data for cellular telephones, and enabling the investigators to determine the location of these devices; and

---

[8] **Standard of review: .** "When reviewing the denial of a motion to suppress, we review the district court's findings of fact for clear error and its conclusions of law de novo." *United States v. Johnson*, 656 F.3d 375, 377 (6th Cir.2011) (quotations omitted).

- Beginning in June, 2010, acting without the authority of warrants, agents affixed GPS tracking devices to vehicles operated by the defendants Carlos and Eric Powell, and monitored those devices to acquire information about the whereabouts of those vehicles and their occupants.

Ultimately, the information gathered through these techniques led or contributed to four warrantless vehicle searches, resulting the in the seizure of drugs, money, and documents, and that evidence in turn, together with information produced by electronically-assisted surveillance, to the issuance of a number of search warrants which turned up still more drugs, money, and records. Taken together, the seized evidence formed the core of the government's case at trial.

Defendant argued that the cell-site/GPS warrants were overbroad, and unsupported by adequate showings of probable cause, and that the applications were fatally tainted by the inclusion of data unlawfully acquired through the trap-and-trace orders. R.E. 74, Motion, ¶ 5, Page ID # 159-160. He challenged the trap-and-trace orders, which called for the collection of "autonomous" (as opposed to intentionally entered) data, as being beyond the reach of the statute under which they were issued, and, insofar as they authorized the acquisition of location data without a showing of probable cause (or even reasonable suspicion), violative of his Fourth Amendment rights. *Id.,* at ¶ 8, Page ID # 161. He also challenged the warrantless use of the GPS tracking devices as a Fourth Amendment violations. *Id.,* at ¶ 9, Page ID # 161.

Finally, he argued that the illegalities attendant to each of these information-gathering activities tainted the physical searches and seizures identified above. *Id.,* at ¶ 11, Page ID # 161-162.

In a written opinion issued January 4, 2013, Judge Murphy denied the challenge to the trap-and-trace orders, and ordered an evidentiary hearing to be held as to the other claims. R.E. 167. Testimony was taken on January 17 and February 12, 2013, and on May 3, 2013, Judge Murphy filed a lengthy Order denying the remaining challenges. R.E. 202.

**The trap-and-trace orders.**

The government's applications sought, and the Orders granted, permission to operate sensing devices designed to acquire electronic data "autonomously" transmitted from cell phones in their area, described as follows:

> radio signals emitted from wireless cellular telephones in the vicinity of the Subject that identify the telephones (e.g., by transmitting the telephone's serial number and phone number) to the network for authentication. By determining the identifying registration data at various locations in which the Subject Telephone is reasonably believed to be operating, the telephone number corresponding to the Subject Telephone can be identified. Data transmitted during autonomous registration is not dialed or otherwise controlled by the telephone user. It is an autonomous transmission that occurs when the phone is turned on and periodically thereafter, regardless of whether a call is being made, and in fact, is clearly separate from the establishment or maintenance of a call.

R.E. 74-12, Application, March 16, 2010, Page ID # 476.

Each of the applications was made, and each or the Orders entered, under the aegis of the Pen/Trap statute, 18 U.S.C. § 3121 *et seq.,* which allows for the issuance of orders without a showing of probable cause, but simply upon the basis of the application of a Government attorney, and "a certification by the applicant that the information likely to be obtained is relevant to an ongoing criminal investigation . . ." 18 U.S.C. § 3122(b)(2).

This lack of rigor is, of course, in keeping with the holding of the Supreme Court in *Smith v. Maryland,* 442 U.S. 735 (1979) - a pre-cellular era case involving a monitoring device attached to a fixed landline, which captured digits dialed by the subscriber in placing a call - that the use of a pen register did not implicate Fourth Amendment rights because telephone subscribers would not "entertain any actual expectation of privacy in the numbers they dial," and thereby voluntarily convey to third-party telephone companies.

It was, and is, defendant's position, however, that neither this analysis, nor the Pen/Trap statute, apply to the kind of "autonomously" transmitted data involved here, and the language of the statute supports this view. Thus, the definitional section of the statute, 18 U.S.C. § 3127, defines the kind of devices which may be authorized under it as follows:

> (3) the term "pen register" means a device or process which records or decodes dialing, routing, addressing, or signaling information

25

transmitted by an instrument or facility *from which a wire or electronic communication is transmitted, . . .*

> (4) the term "trap and trace device" means a device or process which captures the incoming electronic or other impulses which identify the originating number or other dialing, routing, addressing, and signaling information reasonably likely to identify the source *of a wire or electronic communication . . .*

Thus, the statute, by its terms apply to data associated with a wire or electronic "communications." Autonomous transfers of data are not, by their nature, "communications," as the opinion of this Court suggested in *United States v. Forest,* 355 F.3d 942, 949 (6th Cir. 2004), *vacated on other grounds*, 543 U.S. 1100 (2005), in the context of the interception of cell-site data:

> A strong argument exists, however, that cell-site data is not a form of *communication* at all. Communication is defined as "a verbal or written message," or "a process by which information is exchanged between individuals through a common system of symbols, signs, or behavior." Merriam-Webster's Collegiate Dictionary 233 (10th ed.1997). Cell-site data is not a "message," nor is it "exchanged between individuals," but instead is simply data sent from a cellular phone tower to the cellular provider's computers. In contrast, this court has assumed that a phone number transmitted to a pager constitutes an electronic communication. See *United States v. Meriwether,* 917 F.2d 955, 960 (6th Cir.1990). Unlike cell-site data, a phone number sent via a pager is a "message" that is "exchanged between individuals."

While the *Forest* panel did not find it necessary to definitively decide the question, the panel's analysis is strongly persuasive. Along the same lines are the observations of the Third Circuit in *In re Application of U.S. for an Order Directing*

*a Provider of Electronic Communication Service to Disclose Records to Government,*

620 F.3d 304, 317-318 (3d Cir.2010):

> A cell phone customer has not voluntarily shared his location information with a cellular provider in any meaningful way. . . . [I]t is unlikely that cell phone customers are aware that their cell phone providers collect and store historical location information. Therefore, [w]hen a cell phone user makes a call, the only information that is voluntarily and knowingly conveyed to the phone company is the number that is dialed and there is no indication to the user that making that call will also locate the caller; when a cell phone user receives a call, he hasn't voluntarily exposed anything at all. [Internal quotation marks omitted]

Thus, the Pen/Trap statute did not authorize the acquisition of this information, and Judge Murphy's conclusion to the contrary is simply in error.

In addition, the record makes clear that the investigators employed the trap-and-trace device to acquire location information, as is illustrated by the allegations of one of several applications made under the purported authority of 18 U.S.C. § 2703, through which obtain the government obtained subscriber records for various telephones, for periods between 17 and 254 days which was incorporated in the cell site/GPS location data warrant applications:

> On April 20, 2010, at approximately 3:30am, members of the Detroit DEA arrived at Carlos POWELL's residence in Eastpointe, Michigan. Upon arrival at the residence Agents located Carlos POWELL's vehicle parked in the driveway of the residence. While at POWELL's residence, agents electronically identified Nextel cellular telephone 313-293-0755, hereafter referred to as TARGET TELEPHONE #1. The DEA agent knows that TARGET TELEPHONE #1 was the only Nextel cellular

telephone identified at this location. Therefore, the DEA agent believes that the TARGET TELEPHONE is currently utilized by POWELL.

R.E. 74-10, Application, Page ID # 341.

Such use of a trap-and-trace device - to locate a phone, and, inferentially, its user (for it is only this inference which supports the conclusion put forth in the application) - seems clearly foreclosed by the Communications Assistance for Law Enforcement Act of 1994 (CALEA), 47 U.S.C. § 1001, *et seq.,* which, among other things, provides that "with regard to information acquired solely pursuant to the authority for pen registers and trap and trace devices ... call-identifying information shall not include any information that may disclose the physical location of the subscriber (except to the extent that the location may be determined from the telephone number)." 47 U.S.C. § 1002(a)(2).

Defendant concedes, as he must, that the exclusionary rule is not generally applied to remedy violations of statutes, unless those violations also implicate the violation of underlying constitutional rights, unless the statute expressly provides for that remedy. *See, e.g., United States v. Orlando,* 281 F.3d 586, 596 (6th Cir. 2002) (citing *United States v. Giordano*, 416 U.S. 505, 524 (1974)); *United States v. Page*, 232 F.3d 536, 540 (6th Cir. 2000) (citing *United States v. Caceres*, 440 U.S. 741, 754 (1979)). However, whether or not this Court's decision in *United States v. Skinner,* 690 F.3d 772, 781 (6th Cir. 2012) forecloses an argument that the improper

28

employment of the trap-and-trace devices in this case implicated his Fourth Amendment rights,[9] as will be seen, the illegality of this data-acquisition is not without significance, insofar as it concerns the subsequent cell-site/GPS warrants.

**The cell-site/GPS warrants.**

Defendant challenged all of the real-time cell-cite/GPS warrants on the basis that the affidavits upon which they were premised wholly failed to establish present probable cause, and as overbroad, insofar as each of the applications sought, and each of the warrants granted, authority to search for information which was not evidence, but which was said, and found, only to "lead to" evidence. *See, e.g.,* R.E. 74, Motion, Page ID # 159-160; R.E. 106, Supplemental Memorandum, Page ID # 793-794.

In addition, he argued that the second and subsequent warrants were tainted by the reliance of the affidavits upon which they were based on information illegally acquired through the preceding searches. *See, e.g.,* R.E. 74, Motion, Page ID # 159-160. Finally, he argued that the affidavit for the first of the warrants, issued March 11, 2010, for a telephone subscribed to by Mr. Powell, at the home address given on his Michigan driver's license, failed to include information (which was included in the affiant's later submissions) which, had it been included, would have even further

---

[9] To the extent that the trap-and-trace orders permitted, or resulted in, the acquisition of location data on a real-time, long-term basis, the question is hardly free from doubt - see discussion, *infra.*

undermined the probable cause showing, and asked for a hearing pursuant to *Franks v. Delaware,* 438 U.S. 154 (1978).  R.E. 106, Supplemental Memorandum, Page ID # 793-794.[10]

Judge Murphy's opinion focused on the first warrant.  He held, first, that "in light of the considerable, and distinctive, privacy concerns raised by long-term, real-time cell-site tracking . . .  a specific showing is required to establish probable cause

---

[10]    Specifically, defendant identified the following allegations of subsequent affidavits:

- Based on experience and training, your affiant knows that it common for individuals involved in narcotics trafficking to obtain cellular telephones in nominee or fictitious names to avoid detection by law enforcement. (R.E. 74-2, Affidavit, March 31, 2010, Page ID # 198); and

- Your affiant also knows that members of these drug trafficking organization very often maintain one cellular telephone to communicate with their close associates and/or drug suppliers and that these individuals maintain a second, third, or even a fourth cellular telephone to communicate with customers, and/or outside associates.  Your affiant knows that these individuals utilize strict cellular telephone discipline as a way to attempt to avoid detection from law enforcement. (R.E. 74-3, Affidavit, May 7, 2010, Page ID # 212).

Taken together, of course, these statements regarding the kind of cautions customary in the drug trade undercut the likelihood that Mr. Powell would be using a telephone subscribed in his own name, at his home address, in connection with drug-related activity. And, of course, it is well-established that"[i]ntentional or reckless omissions of material information, like false statements, may serve as the basis for a *Franks* challenge." *Rivera v. United States*, 928 F.2d 592, 604 (2d Cir.1991).

when the government seeks a warrant for long-term real-time tracking of an individual

via a cell phone." R.E. 202, Order Page ID # 1619.

The affidavit upon which the March 11, 2010 warrant was present, he held, did

not meet this standard. *Id.,* at 1627-1629. He declined, however, to order suppression

on the basis of the "good faith" exception to the exclusionary rule carved out by

*United States v. Leon*, 468 U.S. 897 (1984) and its progeny:

> Defendants argue that the exception does not apply here because the affidavit is lacking in indicia of probable cause, such that the DEA's reliance on it was objectively unreasonable. An affidavit is lacking in indicia of probable cause, also known as a "bare bones" affidavit, if it contains only "suspicions, beliefs, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge." *United States v. Laughton*, 409 F.3d 744, 748-49 (6th Cir. 2005) (quoting *United States v. Weaver*, 99 F.3d 1372, 1378 (6th Cir. 1996)). This standard is "a less demanding showing than the 'substantial basis' threshold required to prove the existence of probable cause in the first place." *Id.* (quoting [*United States v.*] *Carpenter*, 360 F.3d [591,] 595 [(6th Cir. 2004)]). The Court has already found that the affidavit met the substantial-basis threshold; it necessarily was also not lacking in indicia of probable cause. Accordingly, the good-faith exception applies. The evidence obtained pursuant to the March 11, 2010 warrant for real-time cell-site location data is admissible and will not be suppressed.

*Id.,* at Page ID # 1630.[11]

---

[11]  On the basis of this conclusion, he likewise denied defendant's claims of derivative illegality based on the use of the information gathered under the warrants. *Id.,* at Page ID # 1630-1631.

Unfortunately, Judge Murphy did not substantially address defendant's arguments regarding the inapplicability of the "good faith" exception, and examination of those arguments demonstrates that that exception does *not* salvage the fruits of the search conducted under the March 11 warrant, or those that followed it.

First, even if one accepts Judge Murphy's dubious conclusion that the affidavit provides a "substantial basis" for the proposed search,[12] his opinion simply ignores the

---

[12]    Apart from generalities regarding the affiant's background and  general opinions, its factual representations may be summarized as follows:

- A cooperating defendant in an Arizona case, Ted Morawa who was arrested in November, 2009, began to cooperate in January, 2010, and in the course of that cooperation told investigators that at some unstated times he delivered and arranged the delivery of a large quantity of cocaine and heroin to Carlos Powell, in Detroit, whom he described as "the largest distributor" to whom he had delivered (R.E. 106-1, Affidavit, ¶¶ 7 - 10, Page ID # 802-803);

- A jeweler in the Detroit area identified Carlos Powell as a person who had bought expensive jewelry for cash between July and November 2009 (*Id,*  ¶¶ 11-12, Page ID # 804);

- In March, 2010, the investigators received toll records from T-Mobile Communications that indicated that Carlos Powell was the subscriber for the target telephone (*Id,* ¶14, Page ID # 805); and

- The agents have been unable to locate Carlos Powell by reference to the (address?) information in his toll records and river's license information. (*Id.,* ¶ 15, Page ID # 805).

Thus, nothing in the affidavit establishes that the Target Telephone has been used in any way in connection with any unlawful activity.  And of the failure of the

32

defendant's argument regarding the facial deficiency of the warrant: that the data

which the warrant allowed the gathering of, was beyond the purview of the Fourth

Amendment, because it was not "evidence," but might only "lead to evidence." *See,*

R.E. 74, Motion, Page ID # 177-178; R.E. 127, Reply, Page ID # 930-931.[13] This

affidavit to put a date on the drug transactions which Ted Morawa claims to have conducted with Mr. Powell, the affidavit even fails to establish anything even remotely approaching current probable cause to believe that any unlawful activity was then underway involving Mr. Powell or anyone else.

[13] Indeed, the *only* probable cause finding made by the magistrate judge who issued the warrant was *not* that the data to be acquired would itself be evidence, but only that it would "lead to evidence:"

> The Court finds that there is probable cause to believe that the Requested Information *will lead to evidence of violations* of Title 21, United States Code, Sections 841 (a)(1) and 846, among other offenses, as well as to the identification of individuals who are engaged in the commission of these offenses.

R.E. 106-1, Order, Page ID # 808 (emphasis supplied).

It is a fundamental of Fourth Amendment law, of course, that it must be shown that there is probable cause to believe that a particular thing constitutes contraband or evidence of crime before a warrant may authorize its seizure. *See, e.g., United States v. Washington*, 797 F.2d 1461, 1472 (9th Cir. 1986) ("where a business is searched for records, specificity is required to ensure that only the records which evidence crime will be seized and other papers will remain private."). This is so, of course, because the seizure of "mere evidence" has long been understood to define the outermost boundary of the government's authority under the Fourth Amendment. As Justice Stevens wrote for the Court in *United States v. 92 Buena Vista Avenue,* 507 U.S. 111, 121 (1993):

> [U]ntil our decision in *Warden, Md. Penitentiary v. Hayden,* 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967), the Government had power

singular overbreadth clearly takes the warrant out of the reach of the "good faith" exception, since it was "so facially deficient . . . that the executing officers cannot reasonably presume it to be valid." *United States v. Leon, supra,* at 923.

Judge Murphy's opinion also ignores defendant's contention that application of the "good faith" exception is foreclosed by the affiant's omission of material information - the *Franks* argument identified above, which was squarely presented in the district court. *See, United States v. Leon, supra,* at 923.

Moreover, as defendant repeatedly argued in the district court, under the law of this Circuit, "the *Leon* good-faith exception is inapplicable where a warrant was secured in part on the basis of an illegal search or seizure." *United States v. Davis,* 430 F.3d 345, 358 n. 4 (6th Cir. 2005). As pointed out to the district court, *see,* R.E. 74, Motion, Page ID # 172-176; R.E. 127, Reply, Page ID # 931-932, information unlawfully obtained through the trap-and-trace orders was crucial to the probable cause showing of certain of the cell-site/GPS warrants - specifically, the orders allowing the surveillance which led to the searches and seizures which formed the

---

to seize only property that "'the private citizen was not permitted to possess.'" The holding in that case that the Fourth Amendment did not prohibit the seizure of "mere evidence" marked an important expansion of governmental power. *See Zurcher v. Stanford Daily*, 436 U.S. 547, 577-580, 98 S.Ct. 1970, 1987-1989, 56 L.Ed.2d 525 (1978) (STEVENS, J., dissenting). [Footnote omitted]

34

heart of the government's evidence at trial - because it was only through the use of

the pen/trap devices that the agents were able to discover the identity of the telephones

which were the target of those orders.[14] Thus, application of the "good faith"

exception to the exclusionary rule to these crucial long-term real-time location data

gathering orders is inappropriate.[15]

---

[14] The first GPS warrant , issued March 11, 2010, was for location data on a telephone bearing the number 313-259-5848, the second, issued March 31, for 313-743-7714; the third and fourth, issued May 7 and June 17, for 313-293-0755. According to the affidavit for the third warrant, "[o]n or about April 20, 2010," the affiant "identified cellular telephone number 313-293-0755 . . . as a telephone believed to be connected to the POWELL organization." Affidavit, ¶ 27. While the affidavit does not state how this was accomplished, clearly this "identification" was critical to the establishment of probable cause to issue the GPS/cell site warrant, and those that followed. And, as noted above, as it turns out, it was effected through a pen/trap device. *See,* R.E. 74-10, Application, Page ID # 341.

[15] To be sure, the illegality which attended the conduct preceding the warrant application in *United States v. Davis, supra,* as well as the cases it relied on, *United States v. Reilly*, 76 F.3d 1271, 1282 (2d Cir.1996); *United States v. Bishop*, 264 F.3d 919, 924 n. 2 (9th Cir.2001) involved violation of the defendant's Fourth Amendment rights. Defendant maintains that the illegality attendant to the trap-and-trace orders also constituted a Fourth Amendment violation, but even if the Court feels otherwise, it is hard to see why an agent who "illegally" engages in statutory (as opposed to constitutional) should be rewarded by allowing him the use of the products of those illegalities, or can be said to be acting in "good faith," any more than one who lies or suppresses information.

As this Court wrote in *United States v. Warshak,* 631 F.3d 266, 289 (6th Cir 2010), considering a "good faith" defense to challenged data collection under the Stored Communication Act "it seems evident that an officer's failure to adhere to the boundaries of a given statute should preclude him from relying upon it in the face of a constitutional challenge," noting that "the Supreme Court hinted that the good-faith exception does not apply if the government acted 'outside the scope of the statute' on

**The warrantless use of tracking devices.**

The trial court made the following findings regarding the installation and operation of the tracking devices in question, after hearing testimony from Case Agent Edward Donovan of the DEA:

1. Technical Background

The DEA used a GPS tracker that affixes to the undercarriage or other unobtrusive spot on a vehicle. The tracker is "self-contained," and is found within a storage box that protects it from the elements. The box is attached with magnets to the undercarriage of a vehicle. *Id.* at 16. The GPS unit transmits its coordinates via the internet. During a typical operation, a DEA or other federal agent has a laptop computer with a wireless internet connection. At any time, the DEA agent can "ping" the GPS tracker by pressing a button on the tracking program. The GPS tracker then transmits its coordinates back to the computer. The program can ping a tracker at regular intervals as long as half an hour or as short as every minute, or whenever the agent wishes. *Id.* at 53; Hr'g II. There can be a time delay of up to ten minutes between when the GPS tracker transmits its coordinates and when the DEA agent receives the coordinates on the computer. Hr'g I at 54. The printed records of the location data show only when the data was generated, and not when a DEA agent accessed or received the data. Hr'g II. The GPS tracking device is generally accurate to within several meters, and the location data will state the variation from the coordinate reading. For example, a 12-meter variation and a direction would indicate that the actual GPS unit could be within 12 meters from the coordinate reading. *Id.*

The location data is stored on a remote computer server, capable of being accessed by the DEA, and it is usually archived. Hr'g II. On cross-examination, Donovan testified that archived location data for the first two months of the tracking, beginning around June 10,2010, was

which it purported to rely" in *Illinois v. Krull,* 480 U.S. 340, 360 n. 17 (1987).

inadvertently lost. Typically, the servers keep the data for several months. In this case, the servers overwrote the data as part of an apparently normal record storage procedure. The first available tracking records begin on or around August 31, 2010. *Id.*

2. <u>GPS</u> <u>Tracker</u> <u>Installation</u> <u>and</u> <u>Re-Installation</u>

Before placing the GPS tracking device on Eric Powell's truck, the DEA had amassed considerable evidence about the overall drug trafficking ring and Eric Powell's involvement in it. On approximately June 10, 2010, the DEA located Eric Powell's Chevy Silverado pickup truck parked in the driveway of Eric Powell's residence at 24505 Franklin Farms Drive, in Franklin, Michigan. Hr'g I at 19-21. The DEA changed out the battery on the tracking devices several times. Most of the time, the change-out was done in Eric Powell's driveway. On three occasions, the truck was parked elsewhere: in front of Earnest Proge's residence, in the commercial parking lot of a warehouse, and in the parking lot of a car dealership. *Id.* at 21-22.

Powell's home is in a gated community. A security gate blocked the entrance to Franklin Farms Drive, and on the gate there was a sign reading "private property, no trespassing." To install the GPS device, the DEA agents simply walked around the gate, as it is only a vehicular gate and does not bar foot traffic. Hr'g II. During daylight hours, Donovan has driven to the gate and it has opened automatically. *Id.* Donovan installed the GPS tracker at night, and is unsure whether or not the gate would have opened automatically at that time. *Id.*

R.E. 202, Order, Page ID # 1632-1633.

Defendant contended (and contends) that the warrantless use of the tracking device over an extended period of time (more than four and a half months, according to the testimony at the evidentiary hearing on defendant's motion to suppress, R.E. 296, Transcript, Page ID # 1453-1454) was a Fourth Amendment violation, relying

principally on the Supreme Court's decision in *United States v. Jones,* ____ U.S. ___, 132 S.Ct. 945 (2012),[16] requiring suppression of the location data so acquired and, more importantly, the searches they facilitated.

Judge Murphy declined to decide the question, however, on the basis of his conclusion that the warrantless vehicle searches which accompanied the use of the tracking devices "would be admissible even if the installation and use of the GPS tracker was an unreasonable search otherwise subject to the exclusionary rule." R.E. 202, Order, Page ID # 1635.

Judge Murphy summarized the factual circumstances of the challenged traffic stops as follows:

---

[16] *Jones,* of course, involved the attachment of a GPS tracking device to a vehicle and the use of that device to track the vehicle's movements over a period of 28 days. The four-justice lead opinion, authored by Justice Scalia, held that the Fourth Amendment was implicated by the physical intrusion involved - "[t]he Government physically occupied private property for the purpose of obtaining information." *Id.,* at 949. On the other hand, a different four justices joined a concurring opinion, written by Justice Alito maintained that surreptitious long-term monitoring of the defendant through the GPS device constituted a search because it "impinges on expectations of privacy." *Id.* at 964. Justice Sotomayor, writing separately, "agree[d] with Justice ALITO that, at the very least, 'longer term GPS monitoring in investigations of most offenses impinges on expectations of privacy.'" *id.,* at 955, but observed that drawing appropriate limitations on the scope of such a rule posed difficulties, and "because the Government's physical intrusion on Jones' Jeep supplies a narrower basis for decision . . . join[ed] the majority's opinion." *Id.,* at 957. The warrantless use of the GPS trackers in this case would, defendant submits, be improper under either theory.

(a) The June 23, 2010 warrantless search of a vehicle operated by Benny Whigham.

The first challenged stop after the GPS tracker was placed on Eric Powell's truck, was the traffic stop of Benny Whigham's vehicle on June 23, 2010. On June 22, 2010, the DEA determined, using the GPS tracker, that Eric Powell had traveled from Detroit to Chicago. At some point while Powell was in Chicago, the DEA lost the GPS tracker signal from Powell's truck, and deployed agents to locate the truck visually. Hr'g I at 38-40. The next day, the DEA began physical surveillance of Powell's truck and Whigham's vehicle, following the vehicles to Cicero, Illinois. *Id.* In Cicero, Powell, Whigham, and Earnest Proge left the two vehicles in a restaurant parking lot for a period of time during which an unknown Hispanic male took Whigham's vehicle to a garage, and then returned it to the parking spot several minutes later. *Id.* at 40. The agents, assisted by the Michigan State Police, continued physical surveillance of the vehicles for over ten hours, as they were driven in tandem from Cicero back toward Detroit. Sullivan Aff. ¶ 11, ECF No. 74-9. A state trooper stopped Whigham's vehicle for a traffic violation near Ann Arbor, Michigan. Hr'g I at 44. Whigham granted the police consent to search the vehicle. *Id.*; Sullivan Aff. at ¶ 13. The trooper found thirteen kilograms of heroin in the vehicle. *Id.*

R.E. 202, Order, Page ID # 1637-1638.

(b) The June 28, 2010 warrantless search of a vehicle driven by Juan Valle

On June 28, 2010, the DEA was conducting surveillance of a suspected stash location, a residence at 20109 Conley Street, Detroit, Michigan, using pole cameras and physical surveillance. Nov. 8 Donovan Aff. ¶ 61, ECF No. 74-13; Resp. at 37-38. The DEA observed Juan Valle arrive at the residence, followed shortly thereafter by Carlos Powell. Powell carried a large bag with him into the residence. When Valle emerged later, he placed several objects into his vehicle and drove away. Nov. 8 Donovan Aff. ¶ 61-62. The DEA coordinated with the Michigan State Police in Charlotte, Michigan, to track Valle's vehicle. State troopers stopped the vehicle after a traffic violation. Valle gave

them his consent to search the vehicle. Resp. at 38. State troopers found roughly $259,000 in the vehicle. *Id.* at ¶ 63.

> Although the GPS tracking device was attached to Eric Powell's vehicle during this period, nothing in the record demonstrates that the tracking information had anything to do with the stop of Valle's vehicle. Donovan testified specifically that GPS location data from Eric Powell's vehicle was not used in the events surrounding this search. Hr'g I at 48. Accordingly, the Court finds the GPS tracking data played no, or a highly attenuated, role in this search. Because the traffic stop was legal and Valle consented to search, all evidence from the search is admissible.

*Id.,* at Page ID # 1640.

> (c)     The September 17, 2010 warrantless search of a vehicle driven by Earnest Proge

> Over the course of several weeks of investigation, which included some use of the GPS tracker, the DEA determined that on several occasions Eric Powell and Earnest Proge drove in tandem between Detroit and Michigan. Nov. 8, 2010 Donovan Aff. ¶ 68. On September 17, 2010, while the GPS tracker was still attached to Powell's truck, the DEA used surveillance cameras to independently observe Powell arrive at a residence in Eastpointe, Michigan, and, wearing latex gloves, load several large suitcases into Proge's Ford Flex. Hr'g I at 51; Nov. 8, 2010 Donovan Aff. ¶ 69. Powell drove the Ford Flex to a warehouse in Centerline, Michigan where the DEA continued surveillance of the vehicle using a different pole camera. *Id.* Later, the Ford Flex, now driven by Proge, departed from the warehouse. From their knowledge of Powell and Proge's previously tracked trips, the DEA dispatched agents along Interstate 94 to look for the Ford Flex. Hr'g I at 53. An agent spotted the vehicle proceeding west on Interstate 94 toward Kalamazoo, traveling in tandem with Powell's truck. *Id.* at 53; Nov. 8, 2010 Donovan Aff. ¶ 70. The GPS device may or may not have been used to locate Powell's truck at the same time, but Donovan testified that in his opinion, the DEA would inevitably have located Proge's vehicle on the highway at some point that day because of the multiple DEA and

Michigan State Police officers searching the highway for the vehicle. *Id.* at 57.

      State troopers stopped Proge's vehicle in Calhoun County, after a traffic violation. Nov. 8 Donovan Aff. ¶ 71. Proge at first complied with the stop, but then fled the scene, nearly striking another police officer who had just arrived. Hrg. I at 59. Proge engaged the Michigan State Police in a high-speed chase before pulling over. The police arrested Proge for felony Fleeing and Eluding and Assault of a Police Officer, and searched his car. During the search of the vehicle, troopers discovered more than $2.2 million, as well as a drug ledger, and a newspaper article regarding a Detroit Police Department drug raid. *Id.*; Nov. 8 Donovan Aff. at ¶¶ 71-73.

*Id.,* at Page ID # 1642-1643.

    (d)    The October 22, 2010 warrantless search of a vehicle driven by Margarita Lopez de Vallejo

      The final challenged traffic stop is the search of Margarita de Vallejo's car on October 22, 2010. Donovan had removed the GPS tracker from Eric Powell's truck sometime on September 17, 2010, because he believed its use may have caused suspicion among the drug traffickers. Hr'g I at 60. But on October 1, 2010, after learning that Eric Powell had apparently taken another trip to Chicago for the purpose of exchanging drugs, Donovan replaced the tracker. *Id.* at 61.

      On October 22, 2010, the DEA, using a pole camera, observed Powell loading several suitcases from the Eastpointe residence onto his truck. Nov. 8 Donovan Aff. ¶ 89, ECF No. 74-14. The DEA again established surveillance along I-94 to look for the truck, as well as for a Ford Taurus that agents knew Proge had taken to driving. Hr'g I at 63. Agents spotted the vehicles on I-94 near Romulus, and followed them to the parking lot of a hotel in Ann Arbor. *Id.* at 63-65. Donovan testified that, although agents used the GPS tracking device to help track Powell's movements, the DEA had a sufficient police presence on the road that the agents would inevitably have been able to physically track Powell's truck for the duration of the day. *Id.* at 64. At the hotel, the DEA

> observed Powell and Proge transfer the suitcases from the truck into a Toyota Camry parked behind the hotel. *Id.* at 65; Nov. 8 Donovan Aff. ¶ 94. The DEA agents followed the Toyota, driven by de Vallejo, away from the encounter, and did not follow Powell's truck. The agents then, in conjunction with the Michigan State Police, stopped the Toyota after de Vallejo committed a traffic violation. *Id.* During the stop, de Vallejo gave the officers her consent to search the vehicle. Nov. 8 Donovan Aff. ¶ 95. Officers found 12 kilograms of cocaine and roughly $2 million in currency in the car. *Id.* at ¶ 96.

*Id.,* at Page ID # 1642-1643.

Judge Murphy held that the Whigham stop and search were "sufficiently attenuated from use of the GPS tracker to preclude application of the exclusionary rule," employing a three-factor test he attributed to this Court's decision in *United States v. Gross,* 662 F.3d 393 (6th Cir. 2011): "(1) the length of time between the illegal search and discovery of new evidence; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct." *Id.,* at Page ID # 1638.

"[T]he time factor," he wrote, "is neutral," since "the GPS tracker was used to locate Eric Powell's vehicle in Chicago nearly a full day before the traffic stop," and "[e]ven if the gap . . . can be considered close in time, temporal proximity alone, does not justify suppression." *Ibid.* He identified "multiple intervening circumstances," such as the fact that "the GPS tracker was not used to track Whigham's vehicle at all," that the "vehicle was directly observed by several DEA agents that day," and "would

have inevitably discovered Whigham's vehicle on the highway," as well as his conclusion that "[a]lthough the stop was pretextual, nothing in the record shows that Whigham did not actually violate the traffic laws justifying the stop." *Id.,* at Page ID # 1639. He also held that "the agents' conduct was not flagrant," since they "had no reason to believe installation of the tracker was illegal," and had, in fact, "consulted extensively with the United States Attorney's Office and the DEA general counsel's office regarding use of the tracker." *Ibid.*

As to the stop of Juan Valle's vehicle, Judge Murphy found that "[a]lthough the GPS tracking device was attached to Eric Powell's vehicle during this period, nothing in the record demonstrates that the tracking information had anything to do with the stop of Valle's vehicle," and that the Case Agent had "testified specifically that GPS location data from Eric Powell's vehicle was not used in the events surrounding this search." *Id.,* at Page ID # 1640.

In upholding the stop of the vehicle driven by Earnest Proge, Judge Murphy cited the principle that "that if a suspect's response to an illegal stop is a new and distinct crime, such as flight or use of force, any evidence recovered incident to the arrest for the subsequent crime is not tainted by the unlawfulness of the initial detention," citing this Court's decision in *United States v. Beauchamp,* 659 F.3d 560, 574 (6th Cir. 2011), and held that "[t]he search of Proge's vehicle occurred only after

43

his arrest for unlawful flight, thereby serving to attenuate whatever illegal taint the GPS tracker may have initially provided." *Id.,* at Page ID #1642.

Finally, Judge Murphy upheld the stop of the vehicle driven by Margarita de Vallejo on the basis of "the inevitable-discovery and attenuation doctrines:"

> First, although it is true that agents used the GPS tracker during the pursuit of Eric Powell's vehicle, they did so only after they had observed via the pole camera behavior indicating he was preparing to engage in another illegal drug or money transfer trip. Moreover, as Donovan testified, agents and state troopers were dispatched to locate the truck on the interstate and would inevitably have done so and been able to physically track Powell and Proge as they traveled to Ann Arbor where they met de Vallejo. For these reasons, the Court finds that the agents would inevitably have discovered de Vallejo's involvement, even without the GPS tracking evidence.
>
> Second, like the Whigham stop, the police detained de Vallejo pursuant to a lawful traffic stop, and de Vallejo gave her consent to search. Based on these intervening circumstances, and applying the same legal standards discussed during the Whigham analysis, the Court finds that the agent's use of the GPS device to track Powell was so attenuated from the DEA's actions in stopping de Vallejo's vehicle that the evidence seized in the stop is admissible.

*Id.,* at Page ID # 1643-1644.[17]

These rulings are flawed in a number of significant ways: they are based on a reading of the "attenuation" doctrine which is too narrowly drawn, and misconstrues

---

[17] Having upheld the vehicle searches (which provided the bulk of the information cited by the affidavit upon which they were premised),Judge Murphy also declined to suppress the evidence seized under the challenged search warrants. R.E. 202, Order, Page ID # 1644-1646.

44

the significance of certain of the key "relevant factors," as identified by this Court in cases such as *United States v. Gross, supra,* at 401, on which they purport to rely.  In addition, in some instances, they simply ignore significant evidence developed by the testimony at the evidentiary hearing on the motion to suppress.

Thus, while it is true that in *Gross*, this Court did indeed identify "factors 'such as the length of time between the illegal seizure and the [discovery of evidence or the confession], the presence of intervening circumstances, [and] the purpose and flagrancy of the official misconduct'" as germane to the "attenuation" inquiry, the Court was also at pains to make it clear that one should "consider *all* relevant factors." *Id.,* at 401 (quoting *United States v. Lopez-Arias*, 344 F.3d  623, 630 (6th Cir.2003)).

The trial court's overly constrained, purely linear analysis ignores the realities of modern electronic surveillance techniques.  Here, for more than four and one half months, the investigators relied on their ability to locate the subjects of their investigation through surreptitious, remotely available, electronic surveillance, including, of course, the GPS tracking device.  They knew, at all times, that they could locate the vehicle on which the device was placed from the comfort of their office (or anywhere else they liked), by the click of a mouse button or trackpad, and they did so day in and day out.

The electronic surveillance - including, of course, the GPS tracker - drove and animated the investigation. It was central to it, and inseparable from the outgrowths of its use, including the several vehicle stops involved, since without it, it would have been impossible for the agents to structure the investigation the way they did - neither the inevitable limitations on human resources nor the practicalities of physical surveillance would have allowed them to keep tabs on the subjects or their vehicles at all times, over this extended period of time, in the way the trackers and other location acquisition techniques did.

To try to parse out the particulars of any particular vehicle stop from the conduct of the investigation as a whole ignores these realities, and artificially, unrealistically, and unfairly constrains the attenuation/inevitable discovery inquiry. The electronic surveillance , including the GPS tracker, was an ever-present factor in every phase of the investigation - *just as it was intended to be* - and to ignore the implications of this fact as a "relevant factor" fatally skews the derivative illegality analysis.

In short, where, as here, all aspects of the ongoing investigation were interwoven, interdependent, and location-technology driven, it is simply unrealistic to say that *any* of the evidence "has been come at . . . by means sufficiently

distinguishable to be purged of the primary taint" of the warrantless GPS tracking. *Wong Sun v. United States,* 371 U.S. 471, 488 (1963).

This observation is illustrated by the testimony regarding the way in which the various surveillance techniques interacted in relation to the several vehicle stops at issue. For example, on September 17, when the agents deployed along I-94 in such profusion that the Case Agent opined that they would have inevitably spotted the vehicle driven by Earnest Proge, they did so in significant part because they had - aided by the GPS tracker - noted a pattern of trips along that route which suggested drug trafficking activity. R.E. 296, Page ID # 2272-2273. And, whatever confidence Special Agent Donovan might have had in the physical surveillance which had been established, the fact is that the agent or agents accessing the GPS tracker were actively employing it in their hunt - the data did indeed point to I-94, and the transmission of location data from that device, which was controlled by the monitoring agents, went from once every 30 minutes early in the day to three or four times per minute in the period just before the stop of Mr. Proge was effectuated - in real time, as much data as the equipment could possibly provide. *Id.,* at Page ID # 2274-2277. [18]

---

[18]The record further reflects that the tracking device was being used in the same way in connection with the events of October 22, leading up to the stop and search of the vehicle being driven by Margarita de Vallejo. R.E. 296, Transcripts, Page ID # 2279-2282.

In this thoroughly modern investigation, neither the physical surveillance, nor any of the other conventional investigative techniques, were in fact "distinguishable from," the electronic data acquisition - they were, rather, inextricably entwined with it. Judge Murphy's derivative illegality analysis was fatally flawed by his failure to recognize this basic fact, notwithstanding the fact that it was explicitly pointed out to him. *See, e.g.,* R.E. 127, Reply, Page ID # 935.

Beyond this conceptual failing, the trial judge's derivative illegality rulings were also flawed by his misapplication of the governing law to the facts of the case. Thus:

- Regarding the June 22, 2010 stop of the vehicle driving by Bennie Whigham, Judge Murphy found that the one-day period between the use of the GPS tracker to locate the vehicle driven by Eric Powell and the stop rendered "the time factor" at best "neutral." In fact, the cases which hold that a time interval sufficient to dissipate taint speak of periods of "substantial periods of time," *United States v. Ceccolini*, 435 U.S. 268, 279 (1978) not mere hours, *see, e.g., United States v. Gross, supra,* at 402 ("Gross's voluntary confession occurred approximately two months later").

- In addition Judge Murphy's finding that "the agents' conduct in connection with the Whigham stop was not flagrant" ignores the "purpose" aspect of the "the purpose and flagrancy of the official misconduct" factor identified in *Gross.* As this Court explained in *United States v. Shaw,* 464 F.3d 615, 631 (6th Cir. 2006) "the requisite "quality of purposefulness" can be demonstrated when the arrest, in design and execution, is investigatory in nature."

- As to the September 17, 2010 stop of the vehicle driven by Earnest Proge, the record reflects that the vehicle initially *did* stop when signaled to do so, thus rendering the seizure complete, and that Mr. Proge only attempted to flee when he was being "interview[ed] by the State Trooper who had stopped him. R.E. 176, Transcript, Page ID # 1435-1436. This fact takes the case out of the reach of *United States v. Beauchamp, supra,* on which Judge Murphy relied, and aligns it with decisions such as *United States v. Brown,* 448 F.3d 239, 252 (3d Cir. 2006), where the fact that the defendant "was seized before his aborted escape attempt," so that evidence obtained thereafter would be inadmissible. [19]

In short, his findings are inconsistent with the factual record and the governing law, and will not support the admissibility of the challenged evidence.

Because each of the trial court erred in denying each aspect of Mr. Powell's motion to suppress, this Court should reverse those denials. Because the evidence acquired through the challenged electronic surveillance was patently crucial to the case against him, Mr. Powell's convictions and sentences must be vacated.

---

[19] *See also, United States v. Dupree,* 617 F.3d 724, 736 (3d Cir. 2010), and authorities there cited (discussing "evidence discarded by a defendant during flight from an encounter with the police that constituted an unlawful show-of-authority seizure," and concluding that "[m]ost courts have suppressed such evidence as fruit of the poisonous tree.")

III

THE ADMISSION OF EVIDENCE ACQUIRED BY POLE CAMERAS, AND EVIDENCE DERIVED THEREFROM, VIOLATED DEFENDANT'S FOURTH AMENDMENT RIGHTS.[20]

Prior to trial, the defendant Powell challenged the admissibility of evidence acquired by the operation of a number of "pole cameras" installed on utility poles owned and operated by DTE Energy pursuant to Orders issued under the purported authority of the All Writs Act, 28 U.S.C. § 1651, each allowing continuous video surveillance for periods of up to 90 days. R.E. 145, Motion. None of the applications sought to show, and none of the Orders found, that there was probable cause to believe that the operation of the pole cameras would produce evidence of crime.

There were four such installations in all, but evidence acquired by or derived from only three of the locations was introduced at trial: residential premises as 20109 Conley, Detroit, Michigan and 15765 Stricker, Eastpointe, Michigan, and a commercial property at 24300 Sherwood, Centerline, Michigan.

---

[20] **Standard of review.** "When reviewing the denial of a motion to suppress, we review the district court's findings of fact for clear error and its conclusions of law de novo." *United States v. Johnson*, 656 F.3d 375, 377 (6th Cir.2011) (quotations omitted).

50

The underlying facts were presented to the district court by uncontested proffers of the parties, at a hearing held April 15, 2013, accompanied by photographs and videos from the cameras themselves.  R.E. 489, Transcript, Page ID # 4131-4161.

Ultimately, Judge Murphy concluded that "the question here is whether the pole cameras observed any area protected by the Fourth Amendment under traditional observation and search principles."  R.E. 210, Order, Page ID # 1678.  Concluding that they did not, he denied the motion *in toto*.

Each of the video cameras was located on an elevated utility pole, and each had the ability to pan and zoom.  R.E. 489, Transcript, Page ID # 4132, 4135, 4159.  They could be accessed remotely, through an internet connection, and the video images they captured could be viewed by the agents monitoring them in real time, or as recording. *Id.,* at Page ID # 4135.

In some instances, the  placement of the cameras allowed the investigators to peer into areas within the curtilage of a dwelling.  By way of illustration, below is a screenshot of a surveillance video made at the single-family home located at 20109 Conley, Detroit, which was included in defendant's motion to suppress the pole camera evidence, R.E. 145, Motion, Page ID # 1060, and which shows how the elevated camera was able to afford a view inside the rear fence of the premises:



Also for illustration, below is a screenshot from a surveillance video taken at the single-family home located at 15765 Stricker, Eastpointe. Here the camera's view was up the house's driveway, but its perspective was such as to allow a view of some activities which would not have been visible from street level:



Finally, below is a screenshot of surveillance video taken at the commercial premises located at 24300 Sherwood, Centerline. Here, the camera looked over into a common or forecourt area which was not visible from the street, and although it did not look directly into the interior of the premises, was able to capture portions of the interior, and people going in and out; like all the cameras, it had the ability to rotate and zoom, affording the agents a variety of views:

53



Judge Murphy's conclusion that the cameras did not infringe on legitimate

expectations of privacy hinged on his understanding that it would have been possible

for a person situated in a public place to make the same observations:

15765 Stricker:

While the view is elevated, there are no obstructions the camera looks
over, and an examination of photographs of the area show the driveway
was open and accessible to the public view. Nothing the camera viewed
could not have been viewed publically.

20109 Conley:

This is not a case of a camera peering over a solid fence where the public could not otherwise see, but a case of a camera positioned looking over a semi-visible fence to a location where the public could easily see from another vantage point. The fence itself is half-solid, with the upper half being a lattice array which would not have obstructed the view of people or vehicles coming and going.

Moreover, the portions of the driveway observed would have been visible from other vantage points, not merely the pole camera. An examination of the lines of sight of the exhibit photos reveals that the portions of the driveway observed would be clearly visible to the public view from either the main street, or the houses next door.

24300 Sherwood:

While Defendants argue the common yard was enclosed by other buildings and not visible to the public, examination of the camera footage and photographs of the building reveals the property and common yard was open to many directions and surrounded by roads and alleyways. Nor were there fences or other obstructions preventing any person from observing the Defendants' comings and goings.

R.E. 210, Order, Page ID # 1681-1682 (citations omitted).

Judge Murphy's rigid distinctions based on physical location founder on principles of modern Fourth Amendment jurisprudence. Thus, as discussed previously, in *United States v. Jones, supra ,* a plurality of the Supreme Court held that the Fourth Amendment was violated by a 28-day period of warrantless electronic monitoring of a subject's movements taking place *entirely on public streets.* As the *Jones* plurality recognized, it is the intensity and duration of the electronic

surveillance enabled by contemporary technology - constant, long-term, secret, unobservable, and persistent - which triggers Fourth Amendment interests here, even where the activities might, from time to time, or on particular occasions, be thought to have been conducted "in public." And those interests were surely implicated - and violated - here, where the pole cameras authorized continuous, 90-day periods of observation without any of the kinds of judicial findings the Fourth Amendment requires.

While it is certainly true that the agents could have shinnied up poles, climbed on roofs, or hidden behind bushes in neighbors' yards, and so have been, at least theoretically, in a position to see what the pole cameras did, it is inconceivable, as a practical matter, that they would have done so (or been able to do so) every minute of every day for the periods of time involved here - six months, for example, in the case of the Conley Street house. Their use of the pole cameras, however, eliminated the practical constraints, and allowed an intensive level of observation which, it must ve concluded, crossed the line defining reasonable expectations of privacy.

Indeed, while declining to rule definitively on the issue, in an unpublished opinion in *United States v. Anderson-Bagshaw,* 509 Fed. Appx. 396, 405 (6th Cir. 2012), the Sixth Circuit noted that "[f]ew people, it seems, would expect that the

government can constantly film their backyard for over three weeks using a secret camera that can pan and zoom and stream a live image to government agents."[21]

The Court should hold that the use of the pole cameras constituted a Fourth Amendment violation, and should remand the case with instructions to determine the degree to which this violation tainted the searches and seizures which followed.

---

[21] To this observation, the *Anderson-Bagshaw* panel added: "We are inclined to agree with the Fifth Circuit that "[t]his type of surveillance provokes an immediate negative visceral reaction." *United States v. Cuevas-Sanchez*, 821 F.2d 248, 251 (5th Cir.1987) (stating in dicta that using a pole camera to view curtilage over a 10-foot fence constitutes a Fourth Amendment search). "

**CONCLUSION**

The improper denial of defendant's assertion of his right to self-representation requires that his convictions and sentences be set aside.

Because the issues surrounding the electronic acquisition of data will surely arise on retrial, the Court should also vacate the orders denying defendant's two motions to suppress, and making clear that the data acquisition in this case was unlawful.  Specifically, the Court should hold that the trap-and-trace orders did not properly authorize the acquisition of autonomous or location data, that the "good faith" exception to the exclusionary rule cannot be applied to allow the admission of evidence acquired through the cell-site/GPS warrants, that the long-term warrantless employment of the GPS tracking devices was improper, and that this illegality fatally tainted the four vehicle searches to which they led.  The importance of this evidence requires reversal of the defendant's convictions, but the Court should leave it to the trial court to decide in the first instance the question of taint as to the search warrants subsequently issued, for purposes of any further proceedings.

Finally, the Court should hold that the long-term employment of the pole cameras, without benefit of showings or findings of probable cause, constituted a Fourth Amendment violation.   In this instance, the question of derivative illegality should be left to the trial court in the first instance.

Respectfully submitted,

s/N. C. Deday LaRene
LARENE & KRIGER, P.L.C.
645 Griswold Street, Suite 1717
Detroit, Michigan  48226
(313) 967-0100
E-Mail: d6644@deday.net
Michigan State Bar No. 16420

DATED: April 30, 2015

59

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7)(C), Federal Rules of Appellate Procedure, the undersigned certifies that this brief complies with the type-volume limitations of Rule 32(a)(7)(B), Federal Rules of Appellate Procedure.

The brief contains a total of 13,986 words, exclusive of the Table of Contents, Table of Authorities, Statement in Support of Oral Argument, Designation of Relevant Docket Entries, Certificate of Compliance, and Certificate of Service. It has been prepared, and this word count generated, using WordPerfect X6. The typeface is 14pt Times New Roman.

s/N. C. Deday LaRene
LARENE & KRIGER, P.L.C.
1717 Penobscot Building
Detroit, Michigan 48226
(313) 967-0100
E-mail: d6644@deday.net
Michigan Bar No. P16420

**ADDENDUM**

**DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS**

| Record Entry | Description | Pg ID Range |
|---|---|---|
| 3 | Indictment | 7-27 |
| 74 | Motion to Suppress, with Exhibits | 158-657 |
| 106 | Supplemental Brief, with Exhibits | 793-812 |
| 114 | Response to Motion to Suppress | 846-886 |
| 127 | Reply to Response to Motion to Suppress | 924-938 |
| 145 | Motion to Suppress Evidence Derived from Pole Cameras, with Exhibits | 1053-1121 |
| 159 | Supplement to Motion to Suppress | 1166-1170 |
| 160 | Response to Motion to Suppress Evidence Derived from Pole Cameras, with Exhibits | 1171-1208 |
| 167 | Order Denying Motion to Suppress in Part, and for Evidentiary Hearing | 1265-1280 |
| 168 | Reply to Response to Motion to Suppress Evidence Derived from Pole Cameras | 1281-1286 |
| 171 | Superseding Indictment | 1288-1313 |
| 175 | Photographs (Evidentiary Hearing Exhibits) | 1374-1377 |
| 176 | Transcript of Evidentiary Hearing, January 17, 2013 | 1378-1464 |
| 202 | Order Denying Motion to Suppress | 1590-1647 |
| 210 | Order Motion to Suppress Evidence Derived from Pole Cameras | 1670-1684 |
| 263 | Motion for Reconsideration | 2003-2009 |
| 286 | Order Denying Motion for Reconsideration | 2167-2173 |

| 287 | Transcript of Pretrial, April 10, 2014 | 2174-2204 |
|---|---|---|
| 296 | Transcript/Evidentiary Hearing, February 13, 2013 | 2243-2342 |
| 299 | Motion to Dismiss Counts 11, 12, 13, and 14 | 2374-2376 |
| 300 | Motion to Dismiss Counts 11, 12, 13, and 14 | 2377-2379 |
| 356 | Order Granting Motion to Dismiss Counts | 2746-2747 |
| 469 | Judgment | 4011-4017 |
| 471 | Notice of Appeal | 4025-4026 |
| 489 | Transcript of Evidentiary Hearing(Pole Cameras), April 15, 2013 | 4121-4176 |
| 490 | Transcript of Pretrial, March 26, 2014 | 4177-4216 |
| 491 | Trial Transcript Volume 2 | 4217-4379 |
| 492 | Trial Transcript Volume 3 | 4380-4545 |
| 493 | Trial Transcript Volume 4 | 4546-4644 |
| 494 | Trial Transcript Volume 5 | 4645-4807 |
| 495 | Trial Transcript Volume  6 | 4808-5011 |
| 496 | Trial Transcript Volume 7 | 5012-5192 |
| 497 | Trial Transcript Volume 8 | 5193-5379 |
| 498 | Trial Transcript Volume 9 | 5380-5410 |
| 500 | Transcript of Sentencing , October 17, 2014 | 5411-5442 |

**CERTIFICATE OF SERVICE**

I hereby certify that on April 30, 2015, I electronically filed the foregoing

paper with the Clerk of the Court using the ECF system, which will send notification

of such filing to all counsel of record.

s/N. C. Deday LaRene
LaRene & Kriger, P.L.C.
1717 Penobscot Building
Detroit, Michigan 48226
(313) 967-0100
E-mail: d6644@deday.net
Michigan Bar No. P16420
